Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 161090, Irma Aguilar-Escoto v. Jefferson P. Sessions III. Thank you. Good morning, Your Honors. My name is Carlos Estrada. I represent Ms. Irma Aguilar-Escoto. She's the petitioner in this case. I would like to reserve five minutes for rebuttal. Five? Did you say five? Yes, please. Yes. Thank you. There are a number of issues here that I would like to address. The first one, of course, is the fact that Ms. Aguilar-Escoto, in 2005, was apprehended at the border after escaping from her ex-husband abuser in Honduras. Ms. Aguilar-Escoto, at that time, was not entirely truthful at the first time she was arrested at the border. She told the border patrol agent that she was coming to reunite with her boyfriend, which was not true. Now, the reason she said that was obviously because she was afraid. She was afraid that if she said the wrong thing that she would be sent back. That's not so obvious. I'm sorry? That's not so obvious. It is after 2009, after the second entry in her. And she also told the border patrol agent that she was afraid of returning to Honduras. However, there's a form that the border patrol agents normally fill out, and that form indicated that she was not afraid. It also said that she was coming here to work. So after she was returned to Honduras, she came back in 2009. Again, after suffering a lot of abuse. What is the pathway for us to get around the adverse credibility findings? The reason that, the path for that, Your Honor, would be to reconsider whether these documents are inherently reliable. I would suggest that they are inherently unreliable. The reason I say that, Your Honor, is because we have documents. Which documents are you referring to? I'm referring to the sworn statement that Ms. Aguilar-Escoto gave at the border. In general? I'm sorry, in 2005? In 2005, yes. I was trying to explain to you why I think that these documents are unreliable, Your Honor. When a person comes to the border, generally has been, this person has been through quite a traumatic experience. Crossing the border is not an easy task. Escaping your husband from physical abuse, sexual abuse, that's not an easy thing to do. Most likely, when the person arrives at the border, she will be forced to undress and be searched. And immediately after that, Your Honor, they're brought to a border patrol agent who will question them. Now, the border patrol agent probably has 100 cases that day. So, it is impossible to say with certainty what was said. The only thing we have is what the border patrol is saying that she said. But that, Your Honor, cannot be so reliable that anything else that she says after that. Can I ask you a question? Why does it matter? So, when she has that initial conference with the border patrol agent, and the record, or at least the IJ made a finding that the record shows that she said she did not fear her ex-husband at that point. This is a withholding case. So, tell me, what's the relevance of her subjective fear anyway? Your Honor, the relevance of her subjective fear is that she, in fact, fears returning to undress because she is more likely than not that she will be persecuted again by her ex-husband. So, that fear is still there. But even if she was telling the truth that she didn't fear, isn't the only question on a withholding case is whether she will, it's more likely than not that she will be deprived of her life or her freedom? So, I'm trying to understand what her subjective beliefs have anything to do with it. Can't we just look at the objective evidence? The, this, well, I think we have to look at both, Your Honor. We can't look at both. For a withholding case. For a withholding case, we need to look at both. Because the subjective fear that she has is reason is balanced on the fear of past persecution. So, one cannot be, well, sometimes you may have, you may be able to have a fear of future persecution. So, humor me for a second. If we don't have to consider her subjective beliefs, but only the objective evidence, what is the objective evidence that it is more likely than not that she will be deprived of her freedom or her life? Sometimes referred to as persecution in the cases. Sure. Your Honor, persecution has been established in this case throughout the, there's evidence in the record showing that she was in fact the victim of abuse. So, the IJ says that there is evidence that she was abused. Is that a finding that the IJ found that she was abused, or is it just a description? I believe that that's actually just a description, Your Honor. Okay, so what is the objective evidence? The objective evidence were documents that she submitted from her home country, which are not easy to obtain, by the way. She obtained documents from, she's also been in psychological treatment here in the United States, Your Honor. There's evidence of police reports indicating that she was in fact able to contact the police authorities in Honduras, even though they generally refused to do much about domestic violence. Now, domestic violence is a huge problem in Honduras, and the State Department has said so in the country conditions that were submitted at the time, the 2005 country conditions, and it is a big problem today still, Your Honor. So, in fact, but what I think what I'd like the court to understand is that if you would allow me, that a person who comes to the border is very likely not a very sophisticated person. I want to continue to pursue the line that you were on, though, before you move to that. You have a little more time left. Oh, sure. So the cases seem to say that in the domestic violence context, there needs to be established a pattern similar to other forms of persecution or forms of persecution. Why is that so? You can get a restraining order based on one incident of domestic violence, and you have just alluded to the fact that there's a fair amount of objective outside the record evidence or country condition reports and other reports from Amnesty International, et cetera, that in Honduras there really is no ability to do anything about domestic violence, even if they do issue restraining orders, as they did, I think, twice in this case. Correct. So what I'm asking is in the domestic violence context, should the courts continue to require a past pattern of domestic violence? That's a very difficult question, Your Honor. The reason I say that is because when we're dealing with victims of domestic violence, there is no easy way for a person who has been a victim of domestic violence to go to the police, for example. Right. So I'm not sure you stated this in your brief, but isn't there an Amnesty International report? No, it's a United Nations report that says that approaching a third of the women who are victims of domestic violence in Honduras will ultimately be killed by their partner. Yes, Your Honor. I believe that's part of the record. Yes, Your Honor. And as I was indicating earlier, I started to say earlier, Your Honor, the 2005 State Department country conditions for Honduras indicates, Your Honor, that in fact, for example, I'm talking about rape here, the penalties for rape range from three to nine years imprisonment, and the courts enforce these penalties in practice, because all rapes, with the possible exception of spousal abuse. So now let me ask you this. You're citing to, I think, a 2005 country conditions report. This is a withholding case. Withholding is a temporary form of protection. Does it matter what the country condition reports say today? It does, Your Honor. Depending on what they say, is that a sufficient basis to send the case back? Well, the State Department is an arm of the U.S. government. I think that we owe them some deference. Sometimes, you know, the reports say bad things about, or not very helpful things about our cases, Your Honor.  In this case, consistently, we know consistently that there have been cases of domestic violence in Honduras. So you've reserved a fair amount of time, and I know I led you into areas that I was interested in. I'm sure you'll have time to cover them. Thank you, Your Honor. Good morning, Your Honors. Yudol Yusuf for the government. May it please the Court, the Court should deny the petition for review here because substantial evidence supports the agency's adverse credibility finding, which was the basis for the denial of petitioner's application for withholding of removal. The agency provided specific and cogent reasons in finding that the petitioner lacked credibility. Namely, the agency relied on inconsistencies between the petitioner's testimony and sworn statements on two separate occasions provided during the investigation. So let's say she's an inveterate prevaricator. What does that have to do with withholding? Is she denied withholding because she's a liar? I thought it was just an objective standard, and the objective standard is, what is the likelihood that she will be deprived of her freedom or her life if she's returned? There was a statement in the IJ's opinion, in the IJ's report, that there is evidence of domestic abuse. So tell me how we should frame that. In terms of an applicant seeking withholding of removal as well as asylum, they have the burden of proof of presenting credible evidence in support of their applications. While there is objective evidence that's relevant in these cases, there's also the petitioner's burden to present credible evidence in support of these claims. And here, the credibility being a threshold issue, and which was ultimately the basis for the agency's denial, petitioner failed to present credible evidence to support her claim. While there could be objective evidence in the record to support the claim, ultimately there first has to be an establishment that the petitioner presented a credible claim to begin with. But if there, for example, credible evidence, if there is objective evidence of domestic abuse in Honduras, the key here would be that the petitioner would demonstrate that she was a victim of domestic abuse and that therefore then at that time we would bring in the objective evidence and determine whether or not there was a nexus as well as whether the harm would rise to the level of persecution. For example, the objective evidence would also point us to whether or not the government of Honduras is unwilling, unable to protect. That's where it would come into, in that regard. For our purposes, the petitioner was deemed incredible by the agency, and that's where her application was ultimately denied. Did that answer your question, Your Honor? Well, it's an answer. For me, the question here is, was she abused? And the IJ says there was evidence that she was. I believe that the IJ ultimately found that the petitioner lacked credibility in her claim, and in terms of the IJ ultimately concluded that she did not present credible evidence to support her claim, which was her claim being that she was a victim of abuse in Honduras. And that was, excuse me, the sworn statements provided at the border that were inconsistent with her testimony was where the immigration judge concluded that she lacked credibility. Okay, so on the other side of that, there's an independent police report that I thought suggested domestic abuse, and there's evidence that she received two restraining orders from courts. Yes, that is true, Your Honor. The agency in making an adverse credibility finding can look at the record as a whole, and what they focused more so on while they did observe, while they did note the police reports, they did indicate that there were inconsistencies between the police report in terms of dates and issues like that regarding kind of the timeline of her events of the claim. However, I pulled the court back to specifically the sworn statements and the inconsistencies there. Specifically, as this court recently held in Yee v. Lynch, which is the decision we submitted in a 2018 letter where inconsistencies between an interview at the border and, excuse me, let me just actually give a quick background of Yee in which the court, sorry, the petitioner arrived at the border, was subjected to an interview similar to our case here. The petitioner expressed no fear of returning. However, later on, in a credible fear interview and in testimony, he indicated that he had feared harm based on his Christian faith in China. This inconsistency was relied upon by the immigration judge and the board. Finding that the petitioner failed to provide credible was incredible. This court upheld that decision. Finding substantial evidence supported that adverse credibility determination because the government wasn't, excuse me, the immigration judge and the board were entitled to rely on that document, the DHS interview, in finding and seeing that there was an inconsistency in the petitioner's claim. And this is very similar here. Yee was an asylum claim, was it not? Yes, I believe so. And so fear, subjective belief, mattered in that case. I still don't understand why it matters here. I don't see, in a withholding claim, I don't see any requirement that fear be established. It's nothing about whether it's well-founded. It's just an objective standard. And we have a police report that says that she was abused. We have at least two restraining orders that say she was abused. And we have an IJ saying there was evidence that she was abused. But you say that whether she's credible about whether she had fear or didn't have fear, was lying at one time at the border or another time, somehow plays a role in that determination when the corroborating evidence, the objective evidence, seems to be uncontroverted. Well, ultimately, the petitioner has to present a credible claim. And even in asylum or withholding, in both instances, a credible claim must be presented. If we have a circumstance where there is evidence that would support the claim, but we also have significant evidence that would bring into question the credibility of that claim, then if we are unable to determine, if the agency is unable to determine whether or not the petitioner was, in fact, a credible individual, whether or not the incidents that she spoke of actually occurred, that goes to whether or not that she can meet her burden of proof, specifically that she was harmed on account of a protected ground. Did the EIA seem to think this was an asylum case? Yes, it seemed that they had initially reviewed it under the asylum standard. And that was wrong? It's not an asylum case? No, it's a withholding case. But again, as the bar for asylum is lower than asylum, as we noted in our response in the brief, that this amounts to a harmless error since the petitioner's claim was ultimately heard. Judge Howard, I think you're suggesting that it makes another difference, which is fear of future persecution might be relevant in an asylum case, but the proposition being put forward is that subjective fear would not be relevant in a withholding case. In terms of the subjective fear, I'm having a hard time understanding the distinction that we're making here specifically. But I would say that the petitioners, if we take out the fear aspect, we also look at just the evidence as a whole, whether or not the petitioner was credible in her claim. That's kind of where the agency's determination is focused, is whether or not the evidence she presented, the statements she made, were credible so as to support her burden of proof and finding in establishing eligibility. Suppose we're focused on just trying to determine what happened in fact, and we determine a particular event occurred, but we then need to gauge its degree of severity, repetition, where on the scale it falls. Would the fact that the person who was the victim of that act expresses no fear regarding its repetition bear on our judgment as to gauging how serious the act was? I don't necessarily believe that the fear itself would be relevant to that hypothetical. You don't think that a person who came in and said, X was done with me, but I'm not fearful of it, as opposed to a person who came in and said, X was done to me and I'm terrified it will happen again, that perhaps might consider the latter X to be more significant, hence it produced greater fear? Yes, in that instance, yes, I would indicate that, but obviously these are individual case-by-case sort of determinations, and the person's experiences matter in those situations. So to that point, what's the definition of fear? So if a person is raised in a culture in which 30% of those women who are abused are ultimately killed by their partners, they may just know that they have an incredibly high risk of being killed, but they're used to that culture. So does fear mean being afraid, or does fear just mean, in assessing it, I think this is what's going to happen. Does the definition of fear, since you seem to think that fear plays a role here, does the definition matter? I'm not entirely sure in regards to that. I would say that in these cases, we look at where the burden of proof lies. If the burden of proof lies on the petitioner to demonstrate, to fit within, to establish past persecution or fear of future harm, or in withholding, that more likely than not, they'd be subjected to fear for their life on account of protected ground here. So part of that, the threshold issue, comes to credibility, whether or not we believe that the claim they're putting forward is believable. Excuse me, whether the agency finds that claim credible. And here they did not. So I bring the court back to the credibility issue, and that is, in any of these cases, a threshold issue that the petitioner would have to establish the legitimacy of their claim, the credibility of their claim. And here the agency found that she did not in this instance. So sometimes I think that we, well, and more particularly I, I'm not very fair to counsel in not letting you make your argument, and I might learn more if I let you make your argument. But I do have another question. Sure thing. Does the government take a position in this case that a woman in an abusive domestic relationship in Honduras cannot be part of a protected class? I do not take a position on that. It was not an issue here, so it was never briefed, and so I would not be prepared to take a position. So we don't have to worry about that for purposes of this case. Precisely. In fact, the Board of Immigration Appeals, which the decision we're reviewing here, did not reach the merits specifically to whether or not there was a rise to the level or whether there was an excess. It specifically addressed credibility and found that without presenting credible evidence, her application for withholding removal was then subject to denial based on that ground. So we're focused entirely on the credibility aspect of this claim. So we do not take a position. It's so difficult in this instance because this case, unlike others, you have a person who comes from a challenge, a woman who comes from a challenging culture, but nonetheless sought out the assistance of the government and produced at her hearing government records which demonstrate that, at least in the context of the family court and the police there, that she sought out assistance. And that there are other records from her treating doctor here or psychologist here, which also corroborates that she was the victim of domestic violence. I understand the challenging aspect of this case in terms of the very sensitive nature of it. I'm fully aware of that. In making these credibility determinations under the REAL ID Act, the agency can consider any record evidence regarding the claim, whether it be statements, inaccuracy, written or oral statements, other evidence in the record in making these findings. While there ultimately may be other corroborating evidence, the agency is required to present specific and cogent reasons for its credibility determination. And this court accords significant respect to these credibility determinations under the substantial evidence standard. So here the agency put forward specific bases. We have two sworn statements. And, in fact, in Yee we only had one sworn statement presented in that case, where this court upheld the credibility finding. We have two sworn statements here that contradict, that were inconsistent with subsequent testimony by the petitioner. And we have a sworn statement as the petitioner admitted to fabricating a claim of why she had come in in 2005. She said she came here to work and marry her boyfriend. So we have all of these aspects of these bases which the agency relied on to question her credibility. And I believe that the record supports these findings specifically as it relates to the credibility analysis by the agency. And the petitioner cannot point, cannot demonstrate that these credibility, these bases for finding the petitioner to lack credibility are not supported by the record. They're quite clearly in the record. Well, let me just mention this. A careful scrutiny of the record, and I don't want to waste too much of your time, indicates that some of these findings are not supported by the record. A close scrutiny indicates that some indeed are. There are inconsistencies, but some are just not in the record, if you closely take a look at what the record reveals. So doesn't that undermine the findings when there are clearly allegations of inconsistencies that are not supported by the record? Are there specific inconsistencies that you're referencing that are not supported by the record? Yes. Which one? I found several, but both the IJ and the BIA remarked that the petitioner gave two different explanations for why the abuse began. One stating that it was because she burned some beans, and otherwise stating it was because of jealousy. But this inconsistency does not appear in the record. Her psychologist wrote the abuse began when one day she burned some beans, not because she burned some beans. So it was a finding, but the record doesn't support that as an inconsistency. If I may continue. The immigration judge, as the fact finder, they're in the best position to determine what is and what is not an inconsistency in terms of what they're observing during the proceedings. So I would say that the... But that's not reviewless. Excuse me? That's not reviewless. If the record actually doesn't support the finding, it's not reviewless by us. We have a right to take a look at the record. Of course you're right. I guess what I would say that while there are... I can see that there are differing opinions in terms of reading various inconsistencies relied upon. The fact of the matter is the immigration judge herself noted that there are some inconsistencies that come off as rather minor. However, she observed in relying on this court's decision in PAN was that while there are minor inconsistencies that can be described as quote-unquote small potatoes, we look at the cumulative effect here. We have multiple inconsistencies regarding various dates and changes in terms of the timeline of events. But I'll bring you once more back to the credibility that issued the main one regarding the sworn statements. We have two separate sworn statements where Petitioner expressed no fear of returning. And then we subsequently have testimony in which a claim is raised for the first time. And so in that instance, the agency, as the court did in Yee, observed, found that the petitioner lacked credibility and thus denied her application for relief. Do you know whether the government has taken a position in any case that the U.N. report suggesting that 30% of victims of domestic violence in Honduras are ultimately killed, whether the government has taken a position one way or the other on that kind of evidence, that specific evidence? I'm not aware of that, Your Honor. I can look into that and submit a filing if you'd like. We'll find it. Okay. Thank you. Thank you very much for your time. Good morning again. I cannot represent Ms. Aguilar's quote below, but when I read the record, I too was a little bit shocked, a lot shocked, that the immigration judge simply decided to give so much credence to the fact that she had been beaten by her husband because she had burned some beans. In another instance, the government attorney also questioned her whether she was seven months pregnant when she was beat up by her husband. I kept thinking, how can they not see the central point in this case is that she has been the victim of domestic violence, whether red beans, black beans, whatever it was, that makes absolutely no difference to this case. Those are inconsistencies that cannot and should not be given that much weight. Her memory is faulty, sure. A woman who has been traumatized, is she expected to remember every single time that she was beaten by her husband? No. That's impossible. She did the best she could. She's not a highly educated woman. After being arrested at the border, she was again put through a process where she was interrogated by an official in uniform, possibly armed, and she did the best she could to remember the days. This is the second time I'm speaking, in 2009. The fact that she was abused is indeed a fact. During her hearing, she indicated that her husband had cut her left arm with a pair of scissors. And that's the incident where she says she went to the hospital? Yes. But there are no hospital records that she submitted. And the IJ remarked on the fact that she didn't produce those hospital records. My recollection is that she said she was told the records weren't available. Do you happen to know what efforts have been undertaken with respect to those records? I do not, Your Honor. I do not. I do know that during the hearing, she offered to show the IJ her scar on the left arm. That's part of her testimony. And what happened? The judge didn't want to see it. She said it wasn't necessary. I believe that's certain. It doesn't have her exact voice, but the judge didn't see it. Because I was looking for that. I couldn't figure out what had happened. Right. Right. Exactly, Your Honor. So. We're reviewing the BIA decision here, but I'm having a little trouble from the briefs understanding exactly what you're saying the BIA did wrong here that we should reverse. The BIA relied too heavily, Your Honor, on a three-page report from the Border Patrol agent. That's the problem that we have here. Instead, the BIA and the IJ, they both relied too heavily on that. What they should have done is given all the evidence, including the corroborating evidence that Ms. Aguilar submitted, they both should have given enough weight, Your Honor. And quite frankly, I think that they would have come to the right conclusion, which is that she does, in fact, serve to have withholding of removal in the United States, Your Honor. Now, the government also talks about Yee, that case. That case, Your Honor, is a, as you know, that case is about religious freedom. And in that case, Your Honor, it's obviously a very, very different case in this situation, Your Honor, because that case simply does not, that's the proposition that somebody with, that an asylum applicant from China who has not suffered the kind of abuse, the kind of traumatizing experience that my client has received. It's not the same, Your Honor. We cannot compare the two. This is, Mr. Yee perhaps here for his life, but he, because of his religious freedom, was up at the state. But, you know, he's not a woman. Ms. Aguilar-Escoto cannot change her gender. She cannot change, and that's something that we have consistently seen in the government documents here. Thank you very much, Your Honor. Thank you, Counsel. We are going to take a brief recess. Counsel, in the next case, should not wander very far because it won't be long. All rise. Thank you.